# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
August 14, 2012 Session

## STATE OF TENNESSEE v. CAROLYN NADINE KILLIAN

**Appeal from the Circuit Court for Marion County**
**No. 8906      J. Curtis Smith, Judge**

---

**No. M2011-02591-CCA-R3-CD - Filed December 11, 2012**

---

The Defendant-Appellant, Carolyn Nadine Killian, appeals her conviction for driving under the influence (DUI), first offense, and her sentence of eleven months and twenty-nine days with ten days to be served in confinement and the remainder of the sentence to be served on probation. On appeal, she argues that (1) the evidence was insufficient to support her conviction and (2) the trial court imposed an excessive sentence by failing to consider the purposes and principles of the sentencing act. Upon review, we affirm the trial court's judgment, but we remand the case for entry of a percentage of service for the DUI conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**
**and Remanded for Entry of a Corrected Judgment**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

B. Jeffery Harmon, District Public Defender; Philip A. Condra, Assistant Public Defender, Jasper, Tennessee, for the Defendant-Appellant, Carolyn Nadine Killian.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; James Michael Taylor, District Attorney General; and David O. McGovern, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

The Marion County Grand Jury indicted Killian for DUI, violating the implied consent law, and failing to provide notice to police of an accident. At trial, after the State presented its case-in-chief, the trial court granted Killian's motion to dismiss the count of the indictment charging her with failing to provide notice to police of an accident. On June 1,

2011, a Marion County Circuit Court jury convicted Killian of DUI, and the trial court determined that Killian had violated the noncriminal implied consent law. On September 27, 2011, the trial court sentenced Killian to eleven months and twenty-nine days for DUI, with ten days to be served in confinement and the remainder of the sentence to be served on probation.

Brenda Roth, an officer with the South Pittsburg Police Department, testified that in the early hours of August 4, 2010, she was dispatched to the base of South Pittsburg Mountain where she found a green vehicle that had collided with a guardrail on the wrong side of the road. Officer Roth stated that the car's engine was still running, and Killian was sitting in the driver's seat. She approached the driver's side of the car and asked Killian what had happened. Killian responded that "her car was mad at her." When Officer Roth asked her, "What do you mean your vehicle is mad at you?," Killian replied, "My car is mad at me because I hit the guardrail." She said that Killian was "in a serious mood" when she made these comments regarding her car. During this conversation, Officer Roth noticed that Killian's "speech was very slow, slurred, I mean, it was kind of real lethargic." She then noticed a cup sitting in the center console of Killian's car. She said that just the bottom of the cup had liquid in it and that the substance in the cup had an "alcoholic" smell to it. Officer Roth noticed that when Officer Carter asked Killian to exit her car, Killian "had to hang on the vehicle to walk around and come to the back of the vehicle, because she was unsteady on her feet."

On cross-examination, Officer Roth said that although she was only a foot away from Killian's face during their conversation at the driver's side door, she did not detect the odor of alcohol coming from Killian's person or car. Officer Roth stated that no objects, including the plastic cup containing the liquid, were removed from Killian's vehicle.

Timothy Hudson, a deputy sheriff with the Marion County Sheriff's Department, testified that he also responded to the scene to assist with traffic. He stated that Killian "was wandering around the vehicle, you know, wasn't really for sure what happened." He said that Officer Carter asked Killian for some information, and Killian "tried to produce it, was fumbling through the vehicle." Deputy Hudson stated that Killian "wasn't very steady on her feet at the time" but admitted that he "wasn't actually observing [her] that well" because he was directing traffic.

On cross-examination, Deputy Hudson admitted that he had known Killian for several years prior to trial. He acknowledged that Killian sometimes spoke very slowly, depending on her mood.

William Carter, an officer with the South Pittsburg Police Department, testified that he was the first officer to arrive at the scene at the bottom of South Pittsburg Mountain on Highway 158. Upon arriving, he saw "a small green car . . . embedded into the guardrail" with Killian "in the driver's seat." He said that the car's engine was still running, the car was still in gear, and Killian "was trying to pull off from the guardrail." Officer Carter asked Killian to put her car in park and asked if she was okay because she had been in an accident. He described Killian's demeanor at the time: "She kind of looked at me, and was just kind of in a daze. I was trying to explain to her . . . are you okay. And she just started rambling . . . ." Killian told him that "she was on her way to the top of the mountain to check on some property." Officer Carter said that "[a]t that point [Killian's speech] was slurred." He also noted that Killian "was having trouble concentrating on my questions[.]" Officer Carter asked Killian if she needed any medical assistance, and "she said no." When he asked her what happened, Killian again stated "that she was going to the top of the mountain."

Officer Carter heard Killian tell Officer Roth that "her car was mad at her." He said that when Killian exited the car, she held onto the side of the vehicle in order to keep her balance. Killian denied that she was hurt. When Officer Carter asked her if she had taken anything, "[s]he said she had taken some medication for her back." When he asked her what medication she had taken, she "avoid[ed] the question." At that point, Officer Carter said he was concerned that Killian had been driving under the influence.

Officer Carter informed Killian that she was not under arrest but that he was going to take her to a safe place to perform some field sobriety tests. Killian then accompanied Officer Carter to the Dixie Freeze in South Pittsburg. There, Officer Carter explained and showed her the nine-step walk-and-turn test. When he asked her if she had any medical conditions that would affect her ability to perform the test, Killian replied that "she didn't have any medical problems, [that] she just had problems with her back." When Killian tried to perform the test, "she took one step and then she stepped off the line maybe three steps to the right." She then tried to perform the one-leg-stand test and failed. Officer Carter said that Killian "use[d] her arms for balance" and "was very unsteady on her feet." After seeing her performance on these two tests, Officer Carter concluded that Killian had been driving under the influence, and he arrested her.

Officer Carter read Killian the implied consent form and asked her to submit to a blood test to determine her blood alcohol level. He read the content of the implied consent form to the jury. Officer Carter informed Killian that if she refused the test, she would be charged with violating the implied consent law and, if convicted, her driving privileges would be suspended for one year. He stated that Killian signed the form acknowledging that she had refused to submit to a test.

-3-

Officer Carter said that after her arrest, Killian made the following statement to him: "[Killian] stated that I didn't know who she was – I didn't know who her brother was[.]" When Officer Carter asked Killian who her brother was, she told him that her brother-in-law was Mike Killian, the mayor of South Pittsburg. Then Killian told Officer Carter that he was going to lose his job for arresting her and that he should just let her walk home because she lived across the street from the area where she performed her field sobriety tests. Officer Carter said that Killian's speech at the time was "kind of hard to understand" and "was very slurred[.]"

Officer Carter stated that he made a video recording of Killian's field sobriety tests:

> Any time that we do field sobriety tests, or go to a scene where we run lights and sirens, we turn our cameras on. The camera was on, it did record [Killian's field sobriety tests]. However, at the end of our shift, we leave our cars, and . . . everything on the video is suppose[d] to be there. At the end of my shift, if somebody else drives my car, they get in it, they turn it on, [the recordings] can get erased if you don't remove the information that's on the camera.

Officer Carter stated that when he tried to locate the recording of Killian's field sobriety tests, the recording had been erased.

On cross-examination, Officer Carter said he was unaware that Killian wore false teeth. He also said that he was unsure whether not wearing false teeth would affect the clarity of a person's speech. Officer Carter acknowledged that he did not notice any odor of alcohol emanating from Killian's person and did not see any alcohol in her car at the scene. He said that Killian told him the last time she had taken her back medication was the night before the accident; however, he admitted that he did not put this information in his report. Officer Carter also acknowledged that a breathalyzer test would not detect drugs in a person's system and that an ingestion of drugs is detected only by drawing blood. He confirmed that Killian refused to submit to a blood test. However, he denied that Killian informed him she was scared of needles. He admitted that he did not give Killian the option of taking a breathalyzer test. He also admitted that Killian had a valid driver's license the day of the incident. Officer Carter said that Killian never mentioned that she had rheumatoid arthritis or any physical limitations the day of her arrest.

Randall Killian, the Defendant-Appellant's husband, testified that on the morning of August 4, 2010, he and his wife woke up at 4:15 or 4:30 a.m., drank a cup of coffee, and smoked a cigarette. Then his wife told him that she was going to drive up South Pittsburg

Mountain to check on a piece of property owned by her nephew. He said that she left their home at a little after 5:00 a.m.

Randall Killian said that neither he nor his wife had taken any medications, pills, or drugs and had not consumed any alcohol the morning of the incident. He also said that his wife wore a partial plate of false teeth. When his wife left, he said that she was wearing pajama bottoms and a T-shirt and that he did not believe she had put in her false teeth. Randall Killian said that he and his brother, Mayor Mike Killian, had not spoken for eight or nine years and that his wife had the same strained relationship with his brother.

On cross-examination, Randall Killian admitted that his wife took Xanax twice a day. He said that his wife "usually ke[pt] a bottle of . . . pain reliever" with her for "headaches and stuff like that." He stated that his wife was "easier to get along with" when she took her Xanax and that she took them every morning and night after meals. He said his wife had not taken any Xanax the morning of the accident.

The Defendant-Appellant, Carolyn Killian, age forty-five, testified in her own behalf. She stated that she wore false teeth and had only three real teeth in the top of her mouth. Killian said that she was checking on her nephew's property the morning of her accident:

> [T]hat's where I was going [that morning], and I have been up [to my nephew's property] before. I've been up there and found meth lab stuff up there, and I've called the police. If I go up there, and I see something wrong I call the police. My [nephews], I don't want my [nephews] around that stuff.

Killian said that she took Xanax for anxiety because of childhood trauma that she suffered. She also said she took Hydrocodone and Mobic for her rheumatoid arthritis. She explained that when she was a child a car hit her and her sister as they were crossing a road and that she had to relearn "how to walk, talk, and all that" because of her injuries. She said she had been on medication since she was nine years old.

Killian said that she broke a one milligram tablet of Xanax in two and took a half-tablet four times a day. She also stated she took a half-table of Hydrocodone four times a day. She stated that taking the whole tablets of her medication made her "groggy and sleepy" and taking the half-tablets allowed her to be "more alert" and "not groggy [or] sleepy." She said that she took Xanax to avoid having anxiety attacks.

Killian described how her accident occurred:

I had a cigarette in my mouth, and I was holding the wheel, and I was trying to light it, because the window in the back was out, try[ing] to cover up and light my cigarette. Instead of taking the curve I went straight on, and I was trying to get out of the way. I was trying to move the car, because I was on the other side of the lane, because instead of taking the curve I went straight[.]

She also described her actions once the police arrived at the scene: "I was trying to get out of the way. If there was a possible way I could get out of the way to keep myself [from] getting hurt, keep somebody else from getting hurt. That's . . . going down the mountain. [I was] on the wrong side of the road." She added:

[I was trying to g]et the car out of the road, and then when [Officer Carter] asked me to go down to the Dixie Freeze with him, his partner [asked] me what was I doing when I started my car up, and I was rolling my windows up, because I'm just rolling my windows up. At this time I had no idea I was being placed under arrest. At this time . . . I was upset, I was scared, I was afraid, I was having an anxiety attack. I was scared for my life.

Killian discussed the severity of her rheumatoid arthritis:

It's in my joints, it's in my hips, it's in my ankles, my knees, my shoulders. Well, when I got hit by a car when I was a little girl, it caused me to have juvenile arthritis, and they said it will always be a problem for me, and I'm looking, as my doctor told me, within 15, 17 years I'm looking to be in a wheelchair.

She also clarified the relationship she had with her brother-in-law, Mike Killian:

Mike is my least favorite brother-in-law. I don't like him. I have nothing to do with him. We don't speak. And if you could call him up here he will tell you that, no, I would never say nothing like that, because he's – this is just unreal. There is nothing like that, and I'm sure he'll tell you . . . he likes me least of all . . . the sister-in-laws.

Killian recalled taking the field sobriety tests for Officer Carter:

I can't really tell you the instructions he gave me, because he had me walk [an] imaginary line when there w[ere] lines over there in the parking spaces. He wanted me to walk this line, and I'm like, okay. I was really upset, I was

scared. I mean, I could have got[ten] killed. I could have had somebody else – somebody else could have got[ten] killed over me. I was just frantic, and I'm tired, because I've been gone for the weekend and went to work, got a little sleep, and I was up that morning. I was just frantic.

When her attorney asked if she was physically able to stand on one leg for thirty seconds, Killian replied, "No. No, I've got weak ankles." She said, "[M]y joints, my ligaments, all of them's messed up." Killian said that Officer Carter never asked her if she had any medical conditions that would have affected her ability to perform the field sobriety tests.

When asked about the implied consent form, Killian stated:

> I remember [Officer Carter] reading me some of it. He did not read me all of it. I was willing to take a breathalyzer, but – I've been burned when I was five years old, I've been hit by a car when I was 11, I don't like needles. I don't have tattoos. I have a phobia of needles. They've offered to give me cortisone shots in my knees to help my knees. I don't like needles, and I don't care if it does help my knees, I can't take needles. If I take needles, I'm going to have to be knocked out.

She said that she told Officer Carter that she did not like needles and that she had been burned and had been hit by a car as a child. She also said that she had been willing to take a breathalyzer but had been unwilling to submit to a blood test:

> I signed the paper for a breathalyzer. I don't mind [a] breathalyzer, but I refuse to give blood. I'm not letting you stick no needle in me. Why can't you get a drug urine test? Why do you have to stick me with a needle? I could [submit a urine sample]. I have no problem doing that.

Killian said that she had not consumed any alcoholic beverages within twenty-four hours of her accident and that she had taken her medicine the day of her accident the same way she had taken it for years.

On cross-examination, Killian said that she had not taken her medicine the morning of the accident because she had not yet eaten breakfast. She admitted that she was a phlebotomist, which involves the drawing of blood. She explained, "I don't have a problem sticking you [with a needle]. I can't stand to be stuck." She acknowledged that she had taken a half-tablet of Xanax and a half-tablet of Hydrocodone approximately six hours before she attempted to drive up South Pittsburg Mountain.

## ANALYSIS

**I. Sufficiency of the Evidence.** Killian argues that the evidence was insufficient to sustain her conviction for driving under the influence of an intoxicant. Specifically, she contends that the trial court erred in charging the jury with a pattern jury instruction that "made the word intoxicant to be an all[-]inclusive term that included substances listed in T.C.A. 55-10-401." She asserts that the statute in effect at the time of the offense gave the State four bases upon which to seek a conviction and that the State charged her in the indictment with being under the influence of an "intoxicant," which she argues is synonymous with alcohol, but failed to prove that essential element of the offense beyond a reasonable doubt at trial. In support of this issue, she notes that Officer Roth and Officer Carter, who were at the scene, detected no odor of alcohol coming from her person or car. She also notes that although Officer Roth stated that there was a plastic cup containing liquid with an "alcoholic" smell in her car, no testing was done to determine whether that substance was alcohol. The State, while not addressing each of Killian's issues, merely argues that the evidence, when viewed in the light most favorable to the State, was sufficient to support Killian's conviction. We agree that the evidence is sufficient to sustain her conviction for DUI.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also

"removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010) (citing Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956)). We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)); State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000). The court in Dorantes specifically adopted the standard for circumstantial evidence established by the United States Supreme Court in Holland:

> "Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

Dorantes, 331 S.W.3d at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).

Tennessee Code Annotated section 55-10-401(a)(1), which was in effect at the time of Killian's offense, states that it is unlawful for any individual to drive a vehicle while: "[u]nder the influence of any intoxicant, marijuana, narcotic drug, or drug producing stimulating effects on the central nervous system[.]" T.C.A. § 55-10-401(a)(1) (2008). Here, count 1 of the indictment charged Killian with violating Tennessee Code Annotated section 55-10-401:

> The Grand Jurors of Marion County, Tennessee, duly impaneled and sworn upon their oath, present that:

**CAROLYN NADINE KILLIAN** on the 4th day of August, 2010 in Marion County, Tennessee, and before the finding of this indictment did unlawfully drive or was in physical control of a motor vehicle on any of the Public Highways or Roads of the State of Tennessee, or on any streets or alleys, or while on the premises of any shopping center, trailer park or any apartment house complex, or upon premises which are generally frequented by the public at large while she, the said **Carolyn Nadine Killian** was under the influence of an intoxicant, in violation of **T.C.A. § 55-10-401**, all of which is against the peace and dignity of the State of Tennessee.

The trial court gave the following charge to jury regarding driving under the influence:

Any person who commits the offense of driving under the influence of an intoxicant is guilt of a crime.

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant was driving, or was in physical control of an automobile or motor driven vehicle;

(2) that this act occurred on a public road or highway, a public street;

(3) that the defendant was under the influence of an intoxicant.

The expression "under the influence of an intoxicant" covers not only a well known and easily recognized conditions and degrees of intoxication, but also any mental or physical condition which is the result of taking intoxicants or drugs in any form and which deprives one of the clearness of mind and control of oneself which one would otherwise possess. In this situation it would not be necessary that the person be in such a condition as would make him or her guilty of public drunkenness. The law merely requires that the person be under the influence of an intoxicant or drug. The degree of intoxication must be such that it impairs to any extent the driver's ability to operate a vehicle.

-10-

If after considering all the evidence and these instructions, you find beyond a reasonable doubt that the defendant is guilty of this offense, it shall be your duty to find her guilty.

On the other hand, if you find her not guilty, or if you have a reasonable doubt thereof, then you must acquit the defendant and not guilty would be your verdict.

In addition, the verdict form stated that the following: "We, the jury, find the defendant, Carolyn Nadine Killian, guilty of driving under the influence of an intoxicant, as charged in the indictment . . . ."

Initially, we conclude that the trial court did not err in its instruction to the jury regarding this charge. A defendant has a "'constitutional right to a correct and complete charge of the law.'" State v. Litton, 161 S.W.3d 447, 458 (Tenn. Crim. App. 2004) (quoting State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990), superseded by statute on other grounds as stated in State v. Reid, 91 S.W.3d 247, 291 (Tenn. 2002)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (quoting State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). There is no requirement that a trial court be limited to using pattern jury instructions. State v. West, 844 S.W.2d 144, 151 (Tenn. 1992). When reviewing challenged jury instructions, we must look at "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987) (citation omitted); see State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). Although Killian complains that the jury instruction "made the word intoxicant to be an all[-]inclusive term that included substances listed in T.C.A. 55-10-401[,]" the record shows that the instruction in this case directly followed the pattern jury instruction regarding the offense of driving under the influence. See T.P.I. - Crim. 38.01(a) (providing the jury instruction for the offense of DUI committed prior to January 1, 2011).

Second, although we acknowledge that the term "intoxicant" includes alcohol, see State v. Clark, 355 S.W.3d. 590, 594 (Tenn. Crim. App. 2011) (concluding that "the legislature clearly intended the term "intoxicant" as used in Tennessee Code Annotated section 55-10-401(a)(1) to include alcohol"), we disagree that the term "intoxicant" is limited to alcohol. We note that no definition of the term "intoxicant" appears in title 55 or chapter 10. Consequently, we must determine the legislature's intent in regarding this term. The Tennessee Supreme Court has provided guidance for determining the meaning of statutes:

In construing a statute the Court must give effect to every word, phrase, clause, and sentence of the act to achieve the legislature's intent. United

Canners, Inc. v. King, 696 S.W.2d 525, 527 (Tenn. 1985); City of Caryville v. Campbell County, 660 S.W.2d 510, 512 (Tenn. [Ct.] App. 1983). "Every word used [in a statute] is presumed to have meaning and purpose and should be given full effect if doing so does not violate the obvious intention of the Legislature." Marsh v. Henderson, 221 Tenn. 42, 424 S.W.2d 193, 196 (1968). Furthermore, a statute should be construed, if practicable, so that its component parts are consistent and reasonable; inconsistent phrases should be harmonized, where possible, so as to reach the legislative intent. Id.

Odom, 928 S.W.2d at 29. Moreover, "[l]egislative intent and purpose is to be ascertained primarily from the natural and ordinary meaning of the language used, without a forced or subtle construction that would limit or extend the meaning of the language." Carter v. State, 952 S.W.2d 417, 419 (Tenn. 1997) (citing Tuggle v. Allright Parking Sys., Inc., 922 S.W.2d 105, 107 (Tenn. 1996); National Gas Distrib., Inc. v. State, 804 S.W.2d 66, 67 (Tenn. 1991)). Furthermore, this court has stated that "'[i]n seeking to determine the "natural and ordinary meaning" of statutory language, the usual and accepted source for such information is a dictionary.'" Clark, 355 S.W.3d at 593 (quoting English Mountain Spring Water Co. v. Chumley, 196 S.W.3d 144, 148 (Tenn. Ct. App. 2005)).

Merriam-Webster's Collegiate Dictionary defines "intoxicant" as "something that intoxicates; esp: an alcoholic drink[.]" Merriam-Webster's Collegiate Dictionary 656 (11th ed. 2011). Moreover, the definition of "intoxicate" is "to excite or stupefy by alcohol or a drug esp. to the point where physical and mental control is markedly diminished[.]" Id. Given these definitions, we conclude that the legislature intended the term "intoxicant" in Tennessee Code Annotated section 55-10-401(a)(1) to include alcohol and drugs. Moreover, we do not believe that the legislature intended for the terms "intoxicant, marijuana, narcotic drug, or drug producing stimulating effects on the central nervous system" to be mutually exclusive. See T.C.A. § 55-10-401(a)(1). Instead, it appears that the legislature specifically picked the broad terms in Code section 55-10-401(a)(1) so that these terms would cover any substance that impaired a driver's ability to safely operate a motor vehicle.

Third, to the extent that Killian argues that there was a fatal variance between the indictment and the proof at trial, we conclude that she is not entitled to relief. The Tennessee Supreme Court adopted the following test for determining whether a variance between the indictment and the evidence at trial is fatal:

Unless substantial rights of the defendant are affected by a variance, he has suffered no harm, and a variance does not prejudice the defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised

-12-

at trial, and (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense; all other variances must be considered to be harmless error.

State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984). Because the indictment in this case sufficiently informed Killian of the charge against her, thereby allowing her to prepare her defense without being misled or surprised at trial, and because there was no danger she would be prosecuted a second time for the same offense, we conclude that any variance, if such a variance existed, is not fatal. See id.; see also State v. Patrick O. Crowley, No. E2001-02557- CCA-R3-CD, 2002 WL 1611569, at *3 (Tenn. Crim. App. July 23, 2002) (concluding that there was no fatal variance between the indictment and the proof presented at trial when the defendant was charged with having an alcohol concentration in his blood of .10% or more and the proof showed that the defendant took a intoximeter test rather than a blood test and the intoximeter results established that his breath alcohol content was .11%).

Viewed in the light most favorable to the State, we conclude that the evidence was sufficient to sustain Killian's conviction for driving under the influence of an intoxicant. Officer Roth testified that she found Killian sitting in the driver's seat of her car, which had collided with the guardrail on the wrong side of the road at the base of South Pittsburg Mountain. When Officer Roth asked Killian what had happened, Killian stated, "My car is mad at me because I hit the guardrail." Officer Roth said Killian's speech at the time was "very slow, slurred[, and] lethargic." She noticed that Killian had a cup in the center console of her car that contained liquid that had an "alcoholic" smell. She also noticed that Killian was unsteady on her feet when Officer Carter asked her to exit her vehicle. Officer Hudson testified that Killian was "wandering around the vehicle," was "fumbling through the vehicle" to find information requested by Officer Carter, and was unsteady on her feet. Finally, Officer Carter testified that when he responded to the scene, he found Killian in the driver's seat of a vehicle that was "embedded" in the guardrail on South Pittsburg Mountain. At the time, Officer Carter said that Killian was unsuccessfully attempting to remove her car from the guardrail by driving her car forward. He said Killian was in a daze, was rambling, was slurring her speech, and had difficulty concentrating on his questions. He stated that Killian had to hold onto the side of her car in order to keep her balance when she exited her vehicle. When he asked Killian if she had taken anything, Killian told him she had taken some medication for her back but refused to identify the medication. Officer Carter stated that Killian failed two field sobriety tests before refusing to submit to a blood alcohol test. See State v. Morgan, 692 S.W.2d 428, 430 (Tenn. Crim. App. 1985) (concluding that a defendant's refusal to submit to breathalyzer test was probative of his guilt). After her arrest, Killian told Officer Carter that her brother-in-law was Mayor Mike Killian and that he was going to lose his job for arresting her. We conclude the evidence was sufficient to support Killian's conviction.

**II. Sentencing.** Killian also argues that the trial court's imposition of a ten-day sentence of confinement, which is five times more than the minimum sentence of confinement for DUI, first offense, was excessive and was the result of the trial court's failure to follow the purposes and principles of the sentencing act. Specifically, she asserts that misdemeanants are treated more severely than felons who commit C, D, and E felonies, since such felons are considered to be favorable candidates for alternative sentencing. See T.C.A. § 40-35-102(6)(A) (2006). She also asserts that the trial court, in relying on her eight-year-old conviction for possession of marijuana to impose her ten-day sentence of confinement, failed to follow the guidelines for misdemeanor sentencing in Tennessee Code Annotated section 40-35-302 and failed to follow the sentencing principles in Tennessee Code Annotated section 40-35-103. Finally, she maintains that the trial court failed to provide a percentage of service which she must serve before becoming eligible for rehabilitation programs. The State responds that the trial court did not err in sentencing Killian. We agree that the trial court did not abuse its discretion in sentencing Killian.

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Id. § 40-35-210(b) (2006). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d) (2006), Sentencing Comm'n Comments.

-14-

Because the 2005 amendments to the sentencing act gave trial courts broad discretion in sentencing, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." State v. Bise, — S.W.3d — , 2012 WL 4380564, at *16 (Tenn. Sept. 26, 2012). Moreover, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. at *17. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. Therefore, this court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. Because the trial court sentenced Killian to confinement within the appropriate range for a DUI, first offense, and because the sentence reflected the trial court's proper application of the purposes and principles of the sentencing act, we conclude that the trial court did not abuse its discretion in imposing the sentence in this case. See id.

Killian was convicted of DUI, first offense, a Class A misdemeanor, which carries a maximum sentence of eleven months and twenty-nine days. See T.C.A. § 40-35-111(e)(1) (2006). For a conviction for DUI, first offense, a trial court must sentence a defendant "not less than forty-eight (48) hours nor more than eleven (11) months and twenty-nine (29) days" in confinement. Id. § 55-10-403(s)(1) (2008). In addition, Tennessee Code Annotated section 55-10-403(c)(1) (2008) requires a trial court "to determine what period above the minimum period of incarceration established by statute, if any, is to be suspended." State v. Combs, 945 S.W.2d 770, 774 (Tenn. Crim. App. 1996).

Sentences for misdemeanor offenses must be specific and in accordance with the principles, purpose, and goals of the Criminal Sentencing Reform Act of 1989. T.C.A. §§ 40-35-104, -302 (2006). The sentencing court is granted considerable latitude in misdemeanor sentencing. State v. Johnson, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999) (citing State v. Troutman, 979 S.W.2d 271, 273 (Tenn. 1998)). While a separate sentencing hearing is not mandatory in misdemeanor cases, the court must provide the defendant with a reasonable opportunity to be heard regarding the length and manner of the sentence. T.C.A. § 40-35-302(a) (2006).

"[A] misdemeanor offender must be sentenced to an authorized determinant sentence[,]" and "a percentage of that sentence, which the offender must serve before becoming eligible for consideration for rehabilitative programs, must be designated." State v. Palmer, 902 S.W.2d 391, 394 (Tenn. 1995). Typically, a percentage not greater than 75

percent of the sentence should be fixed for a misdemeanor offender; however, an individual convicted of DUI may be required to serve 100% of his or her sentence. Id. at 393-94.

An individual convicted of a misdemeanor has no presumption of entitlement to a minimum sentence. Johnson, 15 S.W.3d at 518 (citing State v. Baker, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997); State v. Creasy, 885 S.W.2d 829, 832 (Tenn. Crim. App. 1994)). The misdemeanor sentencing statute requires that the trial court consider the purposes and principles of sentencing and the applicable enhancement and mitigating factors when calculating the percentage of the sentence to be served in confinement prior to "consideration for work release, furlough, trusty status and related rehabilitative programs." T.C.A. § 40-35-302(d) (2006). However, there is no strict requirement that the trial court make findings on the record regarding the percentage of the defendant's sentence to be served in confinement:

> [W]hile the better practice is to make findings on the record when fixing a percentage of a defendant's sentence to be served in incarceration, a trial court need only consider the principles of sentencing and enhancement and mitigating factors in order to comply with the legislative mandates of the misdemeanor sentencing statute.

Troutman, 979 S.W.2d at 274 (footnote omitted).

At Killian's sentencing hearing, no proof was presented, although the State admitted the presentence investigation report into evidence. The trial court's oral sentencing findings show that it thoroughly considered the purposes and principles of the sentencing act in determining Killian's sentence. After hearing arguments from counsel, the trial court, noting Killian's 2004 conviction for possession of marijuana, applied enhancement factor (1), that "[t]he defendant ha[d] a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]" T.C.A. § 40-35-114(1). The court then found that the minimum sentence of forty-eight hours in jail would be inappropriate. Instead, the court determined that "[t]en days is appropriate under the facts of this case, with a prior conviction for marijuana" and ordered the remainder of Killian's sentence of eleven months and twenty-nine days to be served on probation. The court also ordered Killian to perform 100 hours of community service, unless she could prove that she was physically unable to do public service work. We conclude that the trial court did not abuse its discretion regarding the length and manner of Killian's sentence.

Finally, we must address Killian's assertion that the trial court failed to provide a percentage of service which she must serve before being eligible for rehabilitative programs. We agree that the judgment form is blank regarding the percentage of the sentence which the

defendant must serve before being eligible for work release, furlough, trusty status, and rehabilitative programs. We note that Tennessee Code Annotated section 40-35-302(d) states that when the trial court fails to designate a percentage of service for a misdemeanor sentence, the percentage shall be zero. However, if we imposed this Code section's provision for a zero percentage of service, it would contravene the minimum period of confinement for DUI, first offense. See Palmer, 902 S.W.2d at 394 (concluding that the "Criminal Sentencing Reform Act . . . does not apply to DUI sentences in those particulars in which the application of the Act would serve to alter, amend, or decrease the penalties specifically provided for DUI"). Consequently, we remand the case to the trial court for the purpose of setting a percentage of service for the DUI conviction.

Because the trial court sentenced Killian within the appropriate range, considered the purposes and principles of the sentencing act, and considered the appropriate enhancement and mitigating factors, we uphold Killian's sentence of eleven months and twenty-nine days with ten days to be served in confinement and the remainder of the sentence to be served on probation. See Bise, — S.W.3d — , 2012 WL 4380564, at *16-17. We affirm the trial court's judgment, but we remand the case for entry of a percentage of service for the DUI conviction.

## CONCLUSION

Upon review, we affirm the trial court's judgment, but we remand the case for entry of a percentage of service for the DUI conviction.

_____
CAMILLE R. McMULLEN, JUDGE